It's been more than 20 years since the court ruled in Redmond v. County of San Diego that a prisoner had a constitutional right to his own personal security. And 30 years since the court ruled in Hopte v. Ray that the prison must provide sufficient staffing levels to ensure a constitutionally adequate response to a prisoner's medical needs. In Redmond, this Court set forth the elements of supervisory reliability that we would govern this particular question. This Court determined that there had to be a constitutionally violated – a constitutionally protected right – I'm sorry, a federally protected right that the conduct of the supervisor somehow deprived the prisoner by an affirmative act, whether the supervisor participates in another – another's affirmative acts, or the omission to perform the act. Here, 40 to 50 floor officers, supervisory staff, and yard staff were removed from the prison for a period of approximately three hours. In the middle of the day, while prisoners were awake, programming, and out of their cells. Not all prisoners were out of their cells, but there was activity in the unit and on the yard. Building 8 is an outpatient unit, a unit for outpatient, seriously mentally ill inmates that are on psychotropic medication. Are outpatient mentally ill patients under constant supervision and observation? Well, I think all inmates are under constant supervision. Outside the context of a prison. Let me just be – get straight to the chase. On that issue, the problem I have with your argument is it seems to me Building 8 was not a building that housed people that demanded constant supervision. It was a building separate – it wasn't the run-of-the-mill inmate, but the separation was because these people were receiving certain kinds of medication that – and I've had other cases involving temperature, where temperature becomes an issue. So it's air conditioned to make sure it doesn't get too hot in the summer. In terms of their mental condition, they're obviously not, quote, normal, whatever that means in the context of a prison, but they're the outpatient level, a classification. And we don't constantly observe outpatient. Usually, I mean, in the outside world, they go for days without being observed. I'm not sure I understand why it is the prison should have thought that a period of time as long as three hours was too long for the kind of observation that would have been obtained if the floor officers had been on the floor. Well, I think out here in the world, Your Honor, you wouldn't – a mentally ill person, such as Mr. St. Jovite, would not have been locked in a room, unable to leave with another mentally ill person, unable to summon assistance, unable to get any kind of help or get away. The problem here is that you have a hundred or so mentally ill people double-celled in their – you know, locked in a room with either their own thoughts and their own mental illness or the mental illness of their roommates. And that that is a situation that would never occur if it occurred out here in the – But that's the whole general population of the prison. Everybody's in an abnormal condition, and the condition is a source of stress. I accept that. Which is why we have – But we don't say that floor officers are required to observe general population prisoners every 45 minutes or whatever it is. Well, required to observe is a different analysis than present and able to open the door when necessary. That we do say – Is there any evidence that the presence of the floor officer by itself would have done – would have resulted in something different? Well, yes, because the control booth officer cannot open a cell door, even if he knows there's an emergency inside. Any evidence that then a call to – either by your client or – was it Lemire? Is that how it's pronounced? Yes. By Mr. Lemire or by his cellmate or by anybody else prior to the episode at the very end where the man down call was made. Well, there were – there was evidence that when Officer Cahoon and Halliday got there that Mr. Harden, the cellie, was calling man down and that there was not an immediate response. But since there was nobody there – Cahoon and Halliday were not there, they could not testify as to whether or not there would have been other – There were other prisoners there. Did any of them testify that there had been a call going out for hours or for any extended period of time? No, I don't believe that Mr. St. Gervais had been hanging for hours. That's why the – when the medical professionals got there, the EMTs got there, they saw fit to give him CPR for 20 minutes before declaring him dead. Any evidence, affidavit or declaration by any expert that says that there should be floor officers either for – in general or for outpatients or mentally ill, that they should be under any type of supervision? Well, yes, Your Honor. There's two answers to that question in the affirmative. One is that Mr. Sullivan, a plaintiff's expert who was a prison practices expert as warden of San Quentin, previous warden of San Quentin, did so provide a report stating that it is necessary, but also, and probably more importantly, the post orders for this particular unit and this particular shift require two floor officers and that each one of those floor officers make security checks around the unit on an hourly basis. So they are posted there. They're supposed to be there. That's what a warden has – the warden had determined was appropriate staffing levels for that unit, and they – and our expert indeed did. And in addition, Warden Carey, who had been the – and Warden Sisto, I believe, both testified, I think – I think it was Warden Carey that testified that he would not pull both officers out because of the danger, that even in a situation such as this, he would pull one officer out or maybe have a – inform the officers on the yard what was happening so they could get back to their post. Furthermore, this institution is generally staffed with supervisory staff that can cover those hourly security checks should the shift officers be unavailable, and there are yard officers generally that are available to do that. None of those officers or personnel were available, because of this meeting, to cover and do those security checks that are supposed to be done on a regular basis to ensure these things don't happen. One more question on the evidence. It seems to me there might be – well, you've at least listed some evidence that suggests what should have been done. What is the evidence that because it wasn't done, it caused the harm? The – well, because there was no officer available to walk around, and as Officer Cahoon testified – I mean, I looked all over for your evidence that would say in this particular instance, if these officers had been doing what they were supposed to be doing, the harm would have been caused. Well – I mean, they would have stopped it, or they could have stopped it, or they could have done anything. I didn't find that. Well, there is a – And so I'm asking you, please tell me where I should have looked. There is an officer – both Correctional Officers Cahoon and Holliday testified that they had – that they – one was a lower-tier officer, one was an upper-tier officer, that their duties were to supervise the activities of the people on the different tiers, which required walking by, doing their security checks, making sure that there's nothing covering a window, being able to see inside so they could see if someone was hanging, or being able to hear, you know, and respond quickly to any need for emergency assistance. Had there been an officer in the unit, they could have responded and – Do we have any evidence that says what you just said? Had they been there, they would have been able to do this, other than circumstantial? Well, their – their – the post orders specifically direct the officers that their primary responsibility is to prevent, or one of their primary responsibilities is to prevent suicides. They are to be looking for activity that is indicative of someone that may be planning a suicide. Since no one was there to be walking up through the unit and watching what was going on, since the security checks at the beginning of the shift were not done by Officer Cahoon as she testified, where she would have normally walked by, looked inside, made sure that privacy curtain was down, made sure that everybody was doing what they were supposed to be doing, and maybe even seen that here's a guy that was planning a suicide, she didn't do it. So it's hard to argue and have evidence proving a negative. They weren't there to see these things like they normally would be. And she did testify that was her usual – that was her responsibility, and that's what she did at the beginning of every shift, and did not do it this time because she was called away to go to a meeting without ever doing the security checks, and the people from the earlier shift had not come back to do it. So nobody did that general security check, which would have pulled the curtain down and perhaps even talked to the guy about why he was hanging a security – a privacy curtain. Let's go to Wong specifically. Is there anything in your complaint that says that Wong had the authority to tell people they didn't need to go to the meeting, or even the authority to suggest he need not attend? There was nothing in the complaint that suggests that, but his job is to oversee the staffing levels of the institution and to make sure – He did have that authority. Why should I find that? It seems to me that Wong, Martinez, and Orrick – I looked all over to see whether they had authority to undo what Nuring and Sisco might have done, and I couldn't find it. Well, I understand that, Your Honor. I think – I didn't find it in the complaint any place. That's right. And I don't – when you say undo what Nuring and Sisco may have done, I think we have to look at what their jobs are. Their job description as they testified is to oversee – Well, why didn't you allege it in your complaint that they should have undone this? Because I have to read the complaint to determine whether I should undo the summary judgment. I don't think I'm understanding the question. Well, I looked at your complaint. That's all I have, really. I got a summary judgment, I got a complaint, and I've got no allegation by you that Wong had the authority or that he should have or that he could have, or Martinez or Orrick – any one of the three could have said anything about this meeting except we all got to go. Well, I can answer that, Your Honor, that no one – nobody was aware of the meeting until Officer Cahoon testified to it in her deposition. So there was no way to know that the reason that the prison had been evacuated was by – of all us prison staff was because the warden or the captain called the meeting. That was not unknown to us at the time we filed the complaint. All we knew was that there was nobody there watching the show, the shop. Did you have any other evidence, then, I ought to look at besides the complaint, except these so-called duties that you allege or that you now argue about, the duty roster, I guess, or the duty? Well, there was an awful lot of testimony in the five excerpts of record and the duties and the experts' reports, as well as the witness statements that were presented, that the depositions in particular talked about – Orrick and Martinez and Wong testified that they had responsibility over the institution, their portions of the institution that they supervised, that their jobs were to make sure that if the staff wasn't available, that they covered, that they went and oversaw and made sure that there were people in the units doing their jobs, that that was every morning when they got there, their job was to go around and make sure everybody was doing their job and that they were there, and if not, to provide cover. Now, it would – the inference being that if they were aware of the fact that all of their units were empty because their floor personnel were at a meeting, that they would go and make sure that the units were in shape and were taken care of. That would seem to be their responsibility. I agree with the Court that I don't believe that a sergeant and a lieutenant have the ability in the chain of command to undo what their captain or their warden tells them, tells their staff. Which was that everybody went to the meeting, right? Right. But as – but officer – but the sergeants had full ability to leave after the half an hour or one hour training session they had to go check and see and make sure that their units were secure and should have according to their job description. All right. So you're not saying that they should have found replacements for the people who were called to the meeting? You're arguing that they themselves should have gone and checked and not remained at the meeting? I think that their job is to make sure that their units are staffed. And if they have the ability to get replacements or have one officer man the floor while the other one goes to the meeting or they man the floor while their officers go to the meeting, that that is what their – or get a replacement in, that their duty is to ensure that their units are staffed. What I'm trying to find out is are you alleging that there were other people available for replacements that they could have recruited or are you saying that they should have – I mean, you said they can't override the captain's orders. So – or the warden's or whoever it is who gave the orders. So we have to eliminate the people who were at the meeting because they were ordered to be at the meeting. Are you saying that they should have gone themselves and left the meeting despite the orders that they be there, or are you saying there were other people at the prison who were not at the meeting that they should have recruited? I don't believe either sergeant or lieutenant testified that they were unable to leave the meeting and that they couldn't go do their jobs. I think that they were – that there was no evidence that they were bound to stay at the meeting for three hours instead of going and doing their jobs. Their jobs – Well, it was one and a half hours, I guess, for each. It was one shift and then another shift. Yes. That's the correct term. So since they were not – they didn't – there's no evidence – they were not bound to stay there, but they were bound to do their job under the job description and making sure that that prison was staffed and that their units were staffed. And if they weren't, at least running and making security checks or making sure that everything is right in a prison. Now, the defendants or appellees argue that, well, this is staffed like it is at night. Well, one, at night there is one officer, according to appellees, that goes from – covers two units, so they can do those security checks, those regular security checks, run around, look in all the windows, make sure everybody's okay, not to mention the fact that everyone's in their cells, presumably asleep, so it's much easier to monitor what's going on. So that was what was happening here. Here we have people out roaming around, people programming. It looks like we're already several minutes over time. I'm sorry? We'll give you a couple of minutes of rebuttal, and depending on – is someone else getting up on your side? No. No, Your Honor. Okay. Depending on what the counsel argues. We only got to one out of two basic issues, but maybe we'll have to discuss the second issue based on the record. We'll see what counsel does. Thank you. Good morning. May it please the Court. Diana Esquivel from the Office of the Attorney General for the State of California on behalf of the defendants and appellees. There was two issues I wanted to discuss, one which the Court has already inquired quite a bit, which is whether the removal of the housing officers rose to the level of deliberate indifference or recklessness. I'll just discuss a couple of few points, and I won't belabor that point. The second issue that I'd like to discuss is whether the time discrepancies pointed out in the reports create a material dispute of fact. And it's defendant's contention that it does not, because there is no consensus in terms of what time the events occurred. However, the undisputed evidence shows that the sequence of the events is undisputed in who was where, such that there was no dispute of material fact as to whether the custody staff should have provided CPR, the actions of the medical staff, and whether any life measures could have saved Mr. St. Jovite. Addressing the Court's issue that it has been discussing with plaintiff's counsel, what we are overlooking here in terms of whether the removal of the officers rose to the level of indifferent is that it is undisputed, plaintiffs did not submit any declaration to contradict or to dispute Mr. St. Jovite's own treating psychiatrist that said that he had no suicidal tendencies, that he did not require any more supervision than any other general population inmate on that yard, that he was at the lowest level of the mental health system that the corrections system provides, and the evidence also shows that Building 8 was staffed like any other building, two floor officers, a control booth officer. It did not have a medical or mental staff stationed in the building. The only thing that differentiated Building 8 from any other building on that yard was that it was air-conditioned because of the symptoms or side effects of the medical medications that some of those inmates were taking for their mental health conditions. If Dr. Ducey did not feel it pertinent or necessary to transfer Mr. St. Jovite to the medical facility, to the hospital, to require him to be placed on suicide watch, then it logically follows that the custody staff who are not medical providers, psychiatric professionals, would have any basis upon which to infer that by leaving the housing unit to have a meeting would pose a substantial risk to Mr. St. Jovite. But don't we have evidence that these particular housing unit people would pass through the particular area on a regular basis? Correct, Your Honor. And don't we have the further facts that passing through this particular area on a regular basis that they missed passing through that particular area on some occasions by going to this meeting? Yes, Your Honor. Therefore, don't we at least have a question of fact as to whether passing through these particular areas at given time periods would have been able to do something in this particular instance? No, Your Honor. And let me explain why it's a no on the last one. It's a no because plaintiffs presented no evidence to state when Mr. St. Jovite hung himself, he hanged himself. It could have happened as soon as the second watch, the shift before, was called to the meeting. It could have happened just five minutes before the officers returned. In the absence of any evidence to raise a question as to when Mr. St. Jovite hanged himself, there is no dispute of fact as to whether the lack of the third watch officers, because there is no second watch officers in this case. It's all the third watch personnel, that it happened on their shift. But we do have evidence, don't we, that his roommate or cellmate called out man down at the time these officers came back? Correct, Your Honor, because that's when you think that there's evidence that that No, because there is no evidence on the record, Your Honor, that they had been calling man down for that long. Okay. So then that leads us to conclude, then, that it must have happened while they should have been there instead of at the meeting. Well, no, Your Honor, because if you look at the record, Mr. Hardin, which is Mr. St. Jovite's cellmate, testified that around the 1 o'clock, 12.30 yard release that was supposed to be scheduled, that's when they announced that there would be no yard. He decided to take a nap. So, again, we're looking at an hour about 12.30, 1 o'clock, when Mr. Hardin decided to take a nap. He did not wake up from that nap until just before he discovered Mr. St. Jovite, which puts the time period somewhere between 3.30, 3.40, around that time period. So, again, it goes back to the question as to no evidence shows when Mr. St. Jovite hanged himself. This sounds like an argument with regard to causation. That is, the absence of the floor officers didn't have the necessary causal link to the injury. That is correct, Your Honor. It goes back to that. That's not the basis for the summary judgment. The summary judgment was based on the absence of evidence to support the proposition that the defendants had sufficient knowledge or had, what is it, awareness of substantial risk of serious harm. Are you suggesting that we should affirm the summary judgment on an alternative ground? This Court is reviewing de novo and can affirm on any ground that it finds. Not only was the district court correct in finding that there was the second prong, even if you were to consider removal of all the officers, creating a substantial risk, that there was no evidence to support the second prong of the deliberate indifference analysis. If the Court concludes that because there is absence of a causal or a new nexus between the officers' conduct. We have a harder time with causation because it's inherently a factual question. We're speculating as to when it was that the hanging or whatever it was that led to the passing of Mr. Shovite occurred. We're speculating as to, I don't know, I've been inside of prisons, but what could be observed. It doesn't sound like there's much evidence with regard to the call for help or the man down, but I don't know that there's much evidence to the contrary either. Is summary judgment an appropriate disposition on a causal issue like that? Well, in this instance, Your Honor, the causal argument was raised more in terms of the medical staff, and I was just addressing this for Your Honor's questions as far as to whether the fact that whether he was discovered earlier or later would create a factual dispute. And again, my argument is that it's not because we do not have evidence on this issue, and it would be pure speculation now as to when Mr. St. Jovite committed suicide. But again, looking at it from the deliberate indifference standpoint and analysis, if Mr. St. Jovite's treater, who treated him for more than three years, found no indication that he was suicidal or he required greater supervision, then it should reasonably follow that the custody staff would have no basis upon which to infer that removal of the floor staff would create a substantial risk to him. Well, isn't that a factual basis, a factual question, too, given the affidavits? I must have read the affidavits of the prison experts who say the purpose of this is to avoid exactly what happened. No, Your Honor, because the only declaration or expert testimony provided was from plaintiff's expert, which is a former warden. But as Your Honors can see from the record, and again, based on your de novo review, he has no training in medicine, no training in psychology. Well, but it says about what is good, what the security precautions for an institution should be, what the purpose of it is, is to avoid this type of occurrence. Correct, Your Honor. The purpose of staff is to make themselves available for any urgency or non-urgent matter that might arise. But at the same time to see that the matter is going to arise. Correct, Your Honor. But by imposing on an officer the ability to not be able for, in this instance, the removal of the officers to hold an emergency meeting, you are then requiring the officers to basically become fortune tellers in terms of, if I leave for this moment, is inmate X going to injure his cellmate? Is inmate Y going to attempt to commit suicide? So you think if they never had anyone walking around and people were getting injured all the time, that wouldn't be any deliberate indifference? No, Your Honor, because as the evidence before the Court is that this situation that occurred in the afternoon of May 10th, 2006, is the situation that occurs every day at the prison, as Plaintiff's counsel pointed out, there is one floor officer during first watch, which is the night watch, to govern to cover two units. Warden Sisto testified, and this is in the record, that sometimes that officer may require to be in one building for several hours sorting mail and taking care of other administrative duties, leaving one building without a floor officer with the control booth officer in place unattended for hours. And while I don't know that Warden Sisto said it's okay to do it for hours. Indeed, he started to suggest that there was a limit, and I forget whether it was like an hour and a half or two hours, and sometimes you had to be hung up in one building and not another. Here we have a period of three hours in one building, and I don't – are you really suggesting that's just okay? No, Your Honor. I'm not suggesting because, again, as you stated, System Warden said it's not okay. But it's not an uncommon situation. And it's also important to point out that what occurred on May 10th is not what happens every day either. This was an urgent situation that required all the officers to attend this meeting. And – But before your time is up, I do want to spend at least a few minutes on the second one, the initial response. As I understand it, the two floor officers, Cahoon and Holliday, they were the first to respond to the scene. And then the first medical employee was Ms. Hack, and she appeared. And throughout that whole time, CPR was not administered to Mr. St. Jovite. Is that correct? That is correct, Your Honor. How is there not at least the possibility of a claim based on those facts? Well, there's a difference, Your Honor, between a claim and a constitutional violation. First of all, the undisputed evidence shows that when Holliday and Cahoon responded to the cell that – and they inquired what was going on, or Cahoon, the primary responder, inquired, she was informed that Mr. St. Jovite hanged himself. She did not have a clear vision. She then – Well, there's some suggestion at least that the response was slow or sluggish, that there wasn't urgency in the response to the call man down. Correct, Your Honor. But again, that difference in testimony does not create a material dispute of fact, because there is no dispute that she responded to the man down. The dispute arises whether she should have ran or walked. Well, I mean, if somebody's manned down, and particularly – I mean, Boy Scout, CPR, seconds matter. You can respond or you can respond with all deliberate speed. I mean, we used to have a Chief Judge, Richard Chambers, who was famous for taking five minutes to ask a question. And why isn't that a factual dispute, that if – sure, I responded. I responded slowly. Well, again, Your Honor, because there is no evidence in terms of what she did other than walk up the stairs. Again, taking the evidence in the light most favorable to the plaintiffs, the evidence shows that Mr. Hardin called a man down, Ms. Cahoon started walking up, and when he told her to run, she said, I don't run to medical emergencies or man downs. I believe her correctness was, I don't run to man downs. But there is no evidence in the record to say that she stopped, walked back to her office, went out the building, went to use the restroom. She continued walking. And again, whether she should have ran or walked does not create a material factual dispute. We're talking a matter of distance of probably 100 feet, going up the stairs, down. Well, there's a little more to it than that. There's a dispute of fact. Now, I don't think we can resolve it, but there's a dispute of fact as to whether there was a four or five minute period when the two, Capone and Holiday, were there and nothing was done. Now, if there's, if one side's right about that, that's the end of it. Holiday and his partner say, no, it wasn't until 2.44 and the medical person was there by 2.45 and we knew or saw she was coming and we waited for the medical person. Then there's no problem. The other side of the story, which also has affidavits, says, no, they were there from 2.40. The medical person didn't arrive till 2.45. Everyone seems to agree the medical person arrived at 2.45. And the other version is from 2.40 to 2.45, they stood around there and didn't do any CPR. Now, that's purely a dispute of fact. Your Honor, it may be a dispute of fact, but it's not material, as I explained when I first started my argument. And the reason it's not material is because there is absolutely no agreement in terms of the time. Even plaintiff's evidence, the declaration she submitted from the inmates who were there, some of them have Mr. Harding calling Mann down at 2 o'clock. Another one, inmate Shepard at 3.20, inmate Kalkin at 2.45.  And that's where it comes from. But duration can matter. Duration can make a difference, particularly talking about CPR. And is it undisputed how long a time period there was between the call to the floor officers who were there to hear the call and their response and the ultimate administration of CPR, which by all accounts appears to have been several minutes later? Correct, Your Honor. If we would accept the premise that in a life-threatening situation CPR needs to be administered rapidly, if it's going to do any good, and I think that's a medically well-established proposition, then the sequence itself doesn't solve the problem, because if you've got a long time duration delay, that could be the source of the injury, couldn't it? It could, Your Honor, but in this instance, you have to separate the medical from the custody, because under the policy governing who provides CPR, that makes a difference in this case. The undisputed evidence showed that when Mr. Hardin called Mann down, both Holliday and Cahoon were already in the building, that they responded. Whether they ran or walked is immaterial. When they got to the floor officers, they were already there. Well, I'll say I'm not so sure of that, but keep going. Because, again But in any event, one theory is that they got there at 2.40, and there are lots of evidence both ways. I mean, there are reports, some evidence that the report that they got there at 2.40 was changed to 2.44. You know, that may not be right, but you say somebody said 2 o'clock. Well, maybe that creates an issue of fact. But I'm talking about the serious dispute, whether it was 2.40 or 2.44. And I don't think there's any dispute over that that's a dispute. And there are affidavits both ways as to 2.40 and 2.44, and there are reports of 2.40 and 2.44. And if we knew it was 2.44, probably there's no delay when they could have done it. If it's 2.40 and they didn't do anything for 5 minutes, then that raises an issue. As Judge Clifton says, just standing for 5 minutes when it's something that's a matter of moments. And as I understand it, the policy, the prism was that you were to perform CPR as soon as possible. If I may respond, I believe my response will also answer Justice Clifton's. Just to judge. No justice here. Your question as well, because I know I'm over time. But the reason that I'm saying that even though the time of the response is disputed and it's not material is because of the sequence in which everyone responded. Hack and Holiday went to the cell when they heard. I'm sorry. Cajun and Holiday responded to the cell when they heard the man down. The policy requires to provide CPR once the area is secured and safely to do so. When Hack and Holiday or, excuse me, when Officers Cajun and Holiday arrived, that was their primary theme, to ascertain what the problem was, what was the situation. When Cajun was informed by Mr. Harden that Mr. St. Jovite had hanged himself, she immediately ordered Officer Holiday to go get the cut down kit because she was left alone there. Again, policy requires that a cell door not be open until two officers are present. Meanwhile, she's ascertaining more information to make sure that this is not a setup that Mr. St. Jovite was not feigning some kind of illness, because, again, Your Honor, this is a prison. They have to be, security is a foremost consideration that they have to consider in their actions. When she saw, when Officer Cajun saw Officer Wade enter, and the undisputed evidence shows that when he entered, so did Ms. Hack enter the building, and she right away signaled for Officer Chua in the control booth to open the door. So when the door opened, Officer Wade was present. So was M.T.A. Hack. So under the prison policy, medical are to assume primary responsibility for a medical situation, and that is an understandable and logical policy. The other version of what the timing was, the other version, was that the doors were opened at 240, and it's from then on that they were there. And I think that's the statement, if I recall correctly, of the officer up above whoever was, you know, looking at things, and he's the one who opened the door, and I think his affidavit said 240. Correct, Your Honor. Even if we take, again, all the evidence and the light most favorable to the plaintiff as we must, Officer Chua's recollection was that he opened the door while Holliday and Hack were, and Cajun were present. Even taking that as is, there is still no dispute that the area was being secured by Officer Cajun, because even Mr. Hardin testified that when the door was open, he had to be brought out, and then he was led away. But the undisputed evidence that when the area was secured, Ms. Hack was present, who is a member of the medical staff. And as such, she has primary responsibility to provide CPR and whatever medical attention had been given to her. Correct, Your Honor. She did not. But that does not raise it to the level of indifference. As far as the custody staff is concerned, just so we can get that out of the way, they followed the policy, because clearly a person trained in medical is going to have better understanding of what treatment the person requires. Whether Hack provided CPR does not raise to a constitutional question, because she did not ignore. Right away, her testimony, and this is undisputed, is that she started checking his pulse, started assessing him. In her training and experience, she made a decision to put the defibrillator as opposed to providing CPR. Whether or not that was the correct decision is a question of the level of care, which raises perhaps maybe medical malpractice at most, but it does not rise to the level of deliberate indifference. Let me change this just a little bit. And I'm cognizant because I don't know exactly what the issues were in front of the district judge, but it seems to me that all of this argument or all of these questions that we're asking goes to a question of liability or potential liability, but nothing about cause. I mean, so that they were there five minutes late or whatever late, what evidence is there in the record that the guy was still alive at all? The evidence, Your Honor, is that he wasn't. All the medical providers, Nurse Hicks, who also is a forensic nurse, and Dr. Noriega all testified that based on the symptoms that he had when they found him, which were consistent and almost identical with the symptoms he had when Ms. Hack found him, was that he was already beyond resuscitation. Well, the reason I ask the question, it seems to me in the Ninth Circuit, there must be evidence of both actual and proximate causation giving the jury the chance to reexamine this question. Now, I would have asked counsel that, but we didn't get to this question, so that's why I ask you. And I think she has to go to that, because it isn't a matter of did they get there on time or whether they did. That is a potential for liability. But we're talking about causation here. So what? If he's already dead, what difference does it make, at least to this part? That's why I was worried about the first question, which has more of a causation issue to me. Well, you said all the medical evidence was that he was dead when they got there. But that's the point. They got there four or five minutes after the guards, and there is evidence that he was alive when the guards were there. The evidence of his co-prisoner, whatever it was, was that his body was warm or whatever it was, and that he looked, whatever he said about him. He said when he was taken out, the prisoner was alive. And indeed, the district court said as much with regard to Hack in the order. I mean, the district court's order says the record is silent on why Hack failed to perform CPR or other life-saving measures on St. Jovite. You've offered up a somewhat different explanation by saying, well, she went around and concluded he was dead, but the district court didn't make a finding to the effect that there was no dispute of fact on that issue. So I'm not sure how we can sustain the summary judgment based on that proposition when, at least the district court said, we don't know exactly why she didn't do it. Yes, Your Honor. Again, your review is de novo. You get to look at the evidence again at first instance. And that evidence is in the record. We did submit it as part of our evidence. Ms. Hack's testimony in her deposition saying that he already had mottling, which is the settling of the blood, his pupils were dilated and nonresponsive, he was cold, and he was dark blue from the chest up. And based on her training experience, he had all the symptoms which to her indicated that he was beyond resuscitation.  Thank you, counsel. Thank you, Your Honor. We've only gone over 13 minutes. You can charge overtime to the State. My apologies. You can have some time, because you didn't discuss the second issue, and some of my colleagues may have questions about it. Should we start with the second issue and ask whether we've got questions? Can I clarify just a couple of things? The Dovey memo, which is the policy regarding the CPR that counsel referred to, it was very clear that the CPR is to be provided by custody and medical in unison, cooperating to get this person, keep this person alive. And so, you know, under counsel's theory, with Ms. Hack running around and taking care of him. Well, it's not illogical for you've got a medically trained person there for the custody, the floor officers to, okay, tell us what to do. And if Hack has decided for whatever reason no CPR, that may be Hack's responsibility. But I have difficulty seeing how the custody officers are at fault for that. Nobody – well, Hack is an MTA, not – you know, she is a medical technician. Right. And she – there's no evidence that she told the officers not to do CPR. There is evidence she started taking a pulse. She started doing things. If a medical person is hovering over the body, I think I'd be real surprised if a prison guard said, no, I'm going to do this over here. I mean, I don't have any difficulty with the proposition that they can properly defer to her if she's doing something different. Except the usual CPR training is you keep doing the CPR while the other person is attached to the end. Well, I never started doing the CPR. Right. So I – Why don't you take – let's go. Okay. Because you had a couple of things you wanted to say. There are a couple of other things I'd like to talk about. The Court addressed the medical people not – that they determined or counseled – that the medical people determined that Mr. St. Gervais was beyond help. But Dr. Noriega did not pronounce death like he could have. He could have kept the EMTs out, these – you know, and said, the guy's dead, they don't have to come. He did not do that. Now, you know, the EMTs came, they determined CPR was appropriate. I don't know that it is – that it is appropriate for the district court or even here for us to decide such a question of fact that was in conflict by the medical professionals at the scene. Even Ms. Hicks, who was present, was very concerned over the fact that there had been no CPR provided by Hack or Harris. So this is – the idea that the – Mr. St. Gervais was already dead is – and too far gone is a question, particularly since you don't give CPR to someone who's alive and breathing. If you're going to crack their ribs and start pounding on their chest, you know – So the answer to my question is the nurse that said she thought there was a question about whether they should have done it, or is there other evidence? Well, Dr. Noriega didn't pronounce him dead. Dr. Noriega could – was there. He could have pronounced him dead. He did not. That's his job. Well, I'm just trying to figure out what your evidence is so I can evaluate that. Well, it's the witnesses at the scene, Mr. Hardin, saying the body was still warm. The fact that Lieutenant Wong, when he came into the scene a few minutes afterwards, saw Hack actually trying to revive Mr. St. Gervais by talking to him. So she believed that there was something more there than the fact that he was now in rigor on the ground. She was talking to him, saying things like, hey, are you feeling okay? Come on, wake up, which, as a – if she's a medically trained person, would indicate that he was a lot closer to being alive than he was in rigor on the ground. As to – you know, I think the Court was correct in its discussion earlier about causation being a question of fact. Because there is all these conflicting – all this conflicting evidence about whether or not CPR would have been effective, I can't see that that isn't a genuine issue of fact for the jury. Also, in going back a little bit about the timing, Ms. Counsel talked about how – remarked on how Cahoon got to the door and sent Holliday to get the cut-down kit. And that was the reason for the delay there. We need to remember, Mr. St. Gervais was already on the ground. He didn't need to be cut down. They had shields, presumably in their – mouth shields, if they were going to do mouth-to-mouth in their pockets. They did not need a cut-down kit to provide care. Also, an issue that has concerned me for the length of this case is that when Cahoon got to the door and thereafter, she had serious concerns that Cahoon – that, I'm sorry, that Cahoon had actually attacked Mr. St. Gervais. So the suicide analysis and the discussion about whether or not Mr. St. Gervais may have been suicidal may be a red herring here. There is a serious question of fact, and was it seen by the officer at the door as to whether or not it was Hardin that harmed Mr. St. Gervais or Mr. St. Gervais who committed suicide? And either way, officers present in the unit would have had gone a great length to prevent that. Does the Court have any other questions about St. Gervais? Scalia. Okay. Thank you. Thank you, counsel. The case here will be submitted. The Court will stand in recess today. Thank you.
judges: Reinhardt, Clifton, Smith